# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

MIGUEL ANGEL IBARRA,

      Petitioner,

v.                                           Case No. 8:18-cv-1219-KKM-JSS

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

Miguel Angel Ibarra, a Florida prisoner, filed a timely[1] pro se Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging his state court conviction for first-degree murder based on alleged failures of his trial counsel and constitutional violations at his trial. (Doc. 1.) Having considered the petition (*id.*) and the response in

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* § 2244(d)(1). This one-year limitations period is tolled during the pendency of a properly filed state postconviction motion. *See* § 2244(d)(2). Ibarra's conviction and sentence were affirmed on appeal on March 6, 2013. His judgment became final 90 days later, on June 4, 2013, upon expiration of the time to petition the United States Supreme Court for a writ of certiorari. *See Bond v. Moore*, 309 F. 3d 770 (11th Cir. 2002). Ibarra allowed 197 days of untolled time to elapse before filing his postconviction motion in state court on December 19, 2013. That motion remained pending until the state appellate court's mandate issued on September 7, 2016. Ibarra states that he filed a motion to correct illegal sentence in state court on June 3, 2016, and that that motion remained pending until April 22, 2018. Although Respondent does not provide the motion to correct illegal sentence or orders relating to it, Respondent does not contest these dates. Ibarra filed his federal habeas petition on May 17, 2018, which is 24 days after the limitations period began to run again. A total of 221 days of untolled time elapsed in this case, and therefore Ibarra's petition is timely.

opposition (Doc. 10), the Court denies the petition. Furthermore, a certificate of appealability is not warranted.

## I. <u>BACKGROUND</u>

### A. <u>Procedural History</u>

A state court jury convicted Ibarra of first-degree murder. (Doc. 10-3, Ex. 16, Vol. 1, p. 63.) The trial court sentenced him to life in prison, (*id.*, pp. 71-73), and denied Ibarra's motion for new trial, (Doc. 10-4, Ex. 16, Vol. 2, pp. 157, 168-257). The state appellate court per curiam affirmed Ibarra's conviction and sentence. (Doc. 10-2, Ex. 5.) Ibarra moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 10-2, Ex. 7.) The state court denied relief, and the state appellate court per curiam affirmed the denial. (Doc. 10-2, Exs. 8, 10; Doc. 10-3, Ex. 14.)

### B. <u>Factual Background and Trial Testimony</u>[2]

The victim, Armando Uribe, was Ibarra's uncle. Uribe referred to Ibarra as "Mijo", a that term meant Ibarra was like a son to him. (Doc. 10-4, Ex. 16, Vol. 4, doc. p. 439.) Uribe and his partner, Melissa Sanchez, had several children. Uribe told Sanchez that he intended to move alone to Texas to take a new job and care for a sick family member, and that when he was established in Texas, Sanchez and the children would join him. (*Id.*, doc. p. 335.) Uribe and Sanchez had argued about this plan. (*Id.*, doc. pp. 335-36.)

---

[2] The Court summarizes the facts from the trial transcript and appellate briefs.

Uribe intended to leave for Texas on March 9, 2010. (*Id.*) At around 11:00 or 11:30 p.m. on March 8, 2010, Ibarra met with Sanchez. (*Id.*, doc. pp. 338-41.) They talked about Uribe's upcoming move, and Ibarra assured Sanchez that, "I got you" in reference to taking care of her and not to worry about what is going to happen. (*Id.*, doc. p. 339—40). Ibarra then sold Sanchez a $20.00 bag of methamphetamine. (*Id.*)

Ibarra and Uribe had argued earlier in the day on March 8, 2010 before Ibarra met up with Sanchez. (Doc. 10-4, Ex. 16, Vol. 5, doc. pp. 484-85.) Ibarra had been having trouble with Uribe and felt like Uribe wanted to "do something" to him. (*Id*, doc. p. 513.) Later that night, Ibarra, Dimas Medrano, Saul Gutierrez, and Luis Alexander were with Uribe at Uribe's house, where they smoked methamphetamine (*Id.*, doc. pp. 485-86.) At some point that evening, Ibarra decided he was going to kill Uribe. (*Id.*, doc. p. 486.) Sanchez had once told Ibarra that Uribe was really upset and was going to kill Ibarra, so Ibarra decided to "get" Uribe first. (*Id.*, doc. p. 514.) And Ibarra felt like Uribe was looking at him with "a crazy look in his eyes." (*Id.*)

Ibarra and Luis Alexander left Uribe's house and went to as a "trap house" (where drugs are sold) on Porter Street. (*Id.*, doc. p. 486.) Marco Salazar was also there. (Doc. 10-4, Ex. 16, Vol. 4, doc. p. 360; Ex. 16, Vol. 5, pp. 486, 514.) Ibarra told Alexander he was going to kill Uribe. (Doc. 10-4, Ex. 16, Vol. 5, doc. pp. 486-87, 514.)

Saul Gutierrez and Dimas Medrano remained at Uribe's house. (*Id.*, doc. p. 487.) Ibarra was going to get a call from Medrano when Uribe was leaving his house; Ibarra planned to meet Uribe at that time and kill him. (*Id.*) After Medrano called Ibarra to say

3

that Uribe was leaving, Ibarra and the others encountered Uribe and Gutierrez on the street. (Doc. 10-4, Ex. 16, Vol. 4, doc. pp. 360-65; Ex. 16, Vol. 5, doc. pp. 488-89, 516-17.)

Ibarra and Uribe exchanged words. (Doc. 10-4, Ex. 16, Vol. 4, doc. pp. 365-66.) Uribe, referring to Ibarra as "Mijo," asked him why he was acting like this, and Ibarra responded that Uribe knew what this was about. (Doc. 10-4, Ex. 16, Vol. 5, doc. pp. 488, 517.) Salazar recalled hearing the words, "You've got to man up," and heard Uribe say, "Do it, Mijo." (*Id.*) As Uribe turned to walk away, Ibarra shot him and shot him again after he had fallen to the ground. (*Id.*, pp. 488-89, 517.) Salazar heard shots and saw part of Ibarra's face in the muzzle flash of a gun. (Doc. 10-4, Ex. 16, Vol. 4, doc. pp. 365-67.)[3] Salazar did not have a gun, and he did not see anyone other than Ibarra with a gun before the shooting. (*Id.*, doc. p. 365.) Everyone but Uribe ran back to the trap house. (*Id.*, doc. p. 367.) Ibarra gave the gun either to Luis Alexander or another acquaintance for disposal. (Doc. 10-4, Ex. 16, Vol. 5, pp. 490, 520-21.)

When police arrived, Uribe was non-responsive. (Doc. 10-4, Ex. 16, Vol. 4, doc. pp. 381, 388.) Police found four .9 mm shell casings on the street near Uribe's body. (*Id.*, doc. pp. 382, 392.) Uribe's cause of death was multiple gunshot wounds. (*Id.*, doc. p. 421.) The medical examiner found three entrance wounds and three exit wounds; the

---

[3] Detective Jason Hatcher's testimony clarified that when a pistol is fired at night, it creates a flash at the end of the barrel and sometimes the flash is "pretty bright." (Doc. 10-4, Ex. 16, Vol. 4, doc. p. 398.)

wounds showed that the bullets had traveled from the back of Uribe's body to the front. (Doc. 10-4, Ex. 16, Vol. 4, doc pp. 421-22, 425-27.) When confronted by law enforcement, Ibarra told police that he was at his grandmother's house all night. (*Id.*, doc. p. 438.)

While in jail awaiting trial, Ibarra received a "Lock Street Thugs" tattoo. (*Id.*, doc. pp. 445-47; Ex. 16, Vol. 5, doc. p. 521).[4] To join the Lock Street Thugs, a person needed to commit murder. (Doc. 10-4, Ex. 16, Vol. 5, doc. pp. 491, 515.) Luis Alexander was the leader of the Lock Street Thugs. (*Id.*, doc. pp. 491, 515.) Two of Ibarra's former cellmates at the jail, John Singleton and Willie Sims, testified at trial that Ibarra confessed to the murder and told them the details of that night. Their testimony included information about smoking methamphetamine at Uribe's house, Ibarra's decision to kill Uribe, and how the murder occurred.[5]

---

[4] A detention deputy, Jeffrey Pyle, testified at trial that Ibarra got the tattoo in the jail. (Doc. 10-4, Ex. 16, Vol. 4, doc. p. 445-47.) Deputy Pyle testified that after Ibarra got the tattoo, he wanted new booking photos taken so that his "people on the street" could see the tattoo. (*Id.*, doc. pp. 449-50.) But later at the hearing on Ibarra's motion for new trial, Deputy Pyle testified that he could not remember whether it was Ibarra or another inmate who wanted new booking photos to show his tattoo. (Doc. 10-4, Ex. 16, Vol. 2, pp. 174-77.) Regardless of this inconsistent memory about the booking photos, Deputy Pyle maintained that Ibarra got the tattoo while in jail. (*Id.*, p. 178.)

[5] Gutierrez died before Ibarra's trial. (Doc. 10-4, Ex. 16, Vol. 3, doc pp. 376-77.) Neither Alexander nor Medrano testified at trial.

## II.   <u>STANDARDS OF REVIEW OF AN APPLICATION UNDER SECTION 2254</u>

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Id.* at 412. A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal

principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

For purposes of § 2254(d)(2), a state court's findings of fact are presumed correct. *See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) ("The factual findings of the state court, including the credibility findings, are presumed to be correct . . . ."). A petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. § 2254(e)(1).

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the

opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Id.* The state may contest "the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

In addition to satisfying the deferential standard of federal court review of a state court adjudication, a federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he

demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

## III. <u>INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD</u>

Ibarra brings several claims for ineffective assistance of counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have

rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.' " *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV. <u>ANALYSIS</u>

### A. <u>Ground One</u>

Ibarra contends that trial counsel was ineffective for not objecting when Melissa Sanchez testified that Ibarra sold her methamphetamine on the night of the murder. Sanchez testified on direct examination about meeting with Ibarra:

> Q.    Okay. Did anything transpire between you and [Ibarra]?
>
> A.    Transpire? What do you mean?
>
> Q.    Were you given anything?
>
> A.    Yes, I was.
>
> Q.    What were you given?
>
> A.    I was given a $20 bag of meth and I gave him $20 for it.

(Doc. 10-4, Ex. 16, Vol. 4, p. 214.)

Ibarra contends that this testimony was irrelevant because it did not relate to the murder. *See* § 90.401, Fla. Stat. (defining relevant evidence as "evidence tending to prove or disprove a material fact") and § 90.402, Fla. Stat. (stating that all relevant evidence is admissible except as provided by law). Ibarra also argues that the testimony was inadmissible under § 90.403, Fla. Stat., because it was more prejudicial than probative and was inadmissible under § 90.404, Fla. Stat., as evidence of a collateral offense. Section 90.403, similar to Federal Rule of Evidence 403, provides that:

> Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.

11

§ 90.403, Fla. Stat.

Additionally, § 90.404, similar but not identical to Federal Rule of Evidence 404(b), provides that:

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

§ 90.404(2)(a), Fla. Stat.

First, the state court found that Ibarra failed to show deficient performance because an objection to Sanchez's testimony would have been overruled. (Doc. 10-2, Ex. 10, p. 2.)[6] The state court explained that "[t]he fact that the conversation" during which Ibarra sold Sanchez methamphetamine "took place and the nature of the conversation was relevant evidence." (Doc. 10-2, Ex. 10, p. 2.) Specifically, the state court relied on the conversation providing a motive for the murder—that Ibarra was upset when talking to Sanchez, who he considered an aunt, about his uncle leaving his

---

[6] In addition to conducting a merits analysis, the State court found that the ineffective assistance of trial counsel claims that are raised in Grounds One, Two, and Four of the § 2254 petition were procedurally barred as successive because they were raised on direct appeal. (Doc. 10-2, Ex. 10, pp. 2, 4, 8.) Respondent acknowledges that this conclusion is erroneous. In Florida, ineffective assistance claims are rarely cognizable on direct appeal. *See Smiley v. State*, 295 So.3d 156, 174 (Fla. 2020). Thus, Respondent does not rely on the state postconviction court's finding of a procedural bar. (Doc. 10, pp. 11, 18, 31.) *See, e.g.*, *Bailey v. Nagle*, 172 F.3d 1299, 1302 (11th Cir. 1999) (stating that a procedural default may occur "where the state court *correctly* applies a procedural default principle of state law to arrive at the conclusion that the petitioner's federal claims are barred[.]") (emphasis added).

family to move to Texas—and therefore "the testimony was, in fact, admissible" under § 90.404 because it was used to establish motive and a timeline of events. (Doc. 10-2, Ex. 10, p. 3.) The state court concluded, therefore, that it would not have been excluded even had counsel objected to the testimony because it was not offered solely to show bad character or propensity. (*Id.*) The state court further found that counsel was not ineffective for failing to object under § 90.403 because "the fact that Defendant sold drugs to Ms. Sanchez is not substantially outweighed by unfair prejudice" and that any prejudice to Ibarra was slight "due to the dissimilarity between the two crimes." (*Id.*)

Whether an objection to Sanchez's testimony on the identified bases would have succeeded is a matter of state evidentiary law. This Court must defer to the state court's application of state evidentiary law and findings that the testimony was admissible under §§ 90.403 and 90.404. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[The United States Supreme Court has] repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."); *Pinkney v. Secretary, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017) ("[A]lthough 'the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension,' [a federal court] 'must defer to the state's construction of its own law' when the validity of the claim that . . . counsel failed to raise turns on state law." (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984))); *Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) ("[T]he Alabama Court of Criminal Appeals has already answered the question of what would have happened had [petitioner's counsel] objected

13

to the introduction of [petitioner's] statements based on [state law]—the objection would have been overruled. . . . Therefore, [petitioner's counsel] was not ineffective for failing to make that objection.").

Additionally, the state court concluded that Ibarra failed to demonstrate prejudice. (Doc. 10-2, Ex. 10, p. 2—3.) Although the state court's reasoning on prejudice was conclusory, this Court must still nonetheless defer to it unless an unreasonable application of *Strickland. See, e.g., Wright v. Moore*, 278 F.3d 1245, 1254-55 (11th Cir. 2003) (stating that the summary nature of a state court's decision "does not lessen the deference that it is due" under § 2254(d) and that "all that is required" for a state court's ruling to constitute an adjudication warranting § 2254(d) deference "is a rejection of the claim on the merits, not an explanation"). Even if the evidence of selling $20 of meth were impermissible under state law, it is not unreasonable for the state court to conclude that it did not create a substantial likelihood that the outcome of the trial would have been different.   Ibarra does not challenge that the state court unreasonably determined the facts in denying his claim. He therefore is not entitled to relief on Ground One.

## B. **Grounds Two and Four**

Grounds Two and Four raise claims of ineffective assistance of trial counsel for not objecting to the jailhouse informants' testimony about Ibarra's drug use. In Ground Two, Ibarra argues that trial counsel was ineffective for not objecting when John Singleton testified that Ibarra used drugs and frequented a drug house. Singleton

testified that prior to the murder, Ibarra, Dimas Medrano, and Saul Gutierrez smoked methamphetamine at Uribe's house. (Doc. 10-4, Ex. 16, Vol. 5, pp. 485-86.) Singleton testified that while they were smoking methamphetamine, Ibarra decided he was going to kill Uribe. (*Id.*, doc. p. 486.) Singleton also testified that after the murder, Ibarra and Gutierrez smoked methamphetamine and returned to the trap house where he gave the murder weapon to a friend to destroy. (*Id.*, doc. pp. 490-91.)[7]

In Ground Four, Ibarra argues that counsel was ineffective for not objecting to Willie Sims's testimony that Ibarra used drugs the night of the incident. Ibarra claims that Sims's testimony was "peppered" with references to Ibarra's drug use. (Doc. 1, p. 13.) Sims testified that Ibarra told him that when Ibarra returned to the trap house after smoking meth with Uribe, Ibarra informed Alexander that he was ready to kill Uribe. (Doc. 10-4, Ex. 16, Vol. 5, p. 514.) He also testified that after the murder, Ibarra and his friends went back to the trap house, where Ibarra tried to get the others to promise

---

[7] Ibarra specifically refers to the following portion of Singleton's testimony:

> [O]nce they got finished doing what they doing [sic], they ran off and went to the trap on Porter. [Ibarra] gave [Gutierrez] ice - - meth to smoke. They was [sic] smoking ice. He was asking question, like, "Are you going to tell; don't tell." And [Guiterrez] kept telling him, "I'm not going to tell. I'm not going to tell." They kept smoking ice. And I guess he got convinced [Gutierrez] wasn't going to tell. He give [sic] him some ice at a cheap price. It was less that what it cost[ ].

(Doc. 10-4, Ex. 16, Vol. 5, doc. pp. 490-91.)

that they would not say anything and gave Gutierrez some meth. (Doc. 10-4, Ex. 16, Vol. 5, pp. 514, 519.)

Ibarra claims that the witnesses' testimony about his drug use was irrelevant, that any probative value of the testimony was outweighed by unfair prejudice under § 90.403, and that the testimony contained inadmissible evidence of collateral crimes under § 90.404.

The state court rejected Ibarra's arguments, finding that an objection to either witness's testimony on the identified bases would have lacked merit. (Doc. 10-2, Ex. 10, pp. 4, 8.) The state court found that the testimony of both witnesses was relevant because it helped establish a timeline of events, as well as Ibarra's motive and plan for the murder. (*Id.*) The state court found that neither witness's testimony would have been excluded under § 90.404 because the testimony was not introduced solely to prove bad character or propensity, but instead established a timeline and showed that Ibarra planned the murder. (*Id.*)

The state court found that the potential risk of unfair prejudice did not outweigh the probative value of either witness's testimony, rendering the testimony admissible under § 90.403. (*Id.*) In particular, the state court found that the risk the jury would convict Ibarra for murder based on his drug-related activity was low, as Ibarra was not on trial for drug charges. (*Id.*, pp. 4, 8-9.) The state court concluded that Ibarra failed to establish either deficient performance or prejudice.

16

Ibarra has not shown that the state court unreasonably rejected his claim.[8] Again, this Court must defer to the state court's application and determination of state evidentiary law, which is determinative of the state court's ruling on Ibarra's ineffective assistance claims. *See Pinkney*, 876 F.3d at 1295; *Callahan*, 427 F.3d at 932. Ibarra fails to show that the state court unreasonably applied *Strickland* and he does not argue that it unreasonably determined the facts in denying his claims. He is not entitled to relief on Ground Two or Ground Four.

## C. Ground Three

Ibarra contends that trial counsel was ineffective for failing to investigate, interview, and call potential alibi witnesses Miguel Ibarra, Sr. (his father) and Maria Ibarra (his grandmother). Ibarra also argues that trial counsel was ineffective for failing to cross-examine Marco Salazar regarding his alleged admission to having smoked methamphetamine around the time of the murder.

### 1. Prospective Alibi Witness Miguel Ibarra, Sr.

Ibarra contends that his father, Miguel Ibarra, Sr., could have provided an alibi by testifying that "he picked Petitioner up at a residence on Porter Street around 9 p.m.

---

[8] The state court also noted that Marco Salazar testified that Ibarra was at a drug house before and after the murder, but that Ibarra did not argue that Salazar's testimony should have been excluded. Thus, the state court reasoned, the information about Ibarra's location would have come in through Salazar's testimony even if Singleton and Sims were prohibited from testifying about it. (Doc. 10-2, Ex. 10, pp. 5, 9.) The portions of Salazar's testimony cited by the state court do not clearly state that the "trap" house was a drug house. (Doc. 10-4, Ex. 16, Vol. 4, doc. pp. 360, 367-68.) However, Ibarra does not argue or demonstrate that the state court's decision was "based on" an unreasonable determination of fact. 28 U.S.C. § 2254(d)(2).

and would have verified that Petitioner remained there all night and slept until the morning." (Doc. 1, p. 9.)

In rejecting Ibarra's claim, the state found that counsel did investigate whether individuals including Ibarra's father could testify as to Ibarra's location on the night of the murder, and that counsel's investigator spent 140 hours working on the case. (Doc. 10-2, Ex. 10, p. 5.) The state court found that Ibarra's father refused to cooperate with police. (*Id.*) Therefore, the state court found, counsel was unable to find an alibi witness despite conducting an investigation. (*Id.*) Given the absence of any sworn statement from Ibarra's father about his prospective testimony, the state court also found that Ibarra's claim was too speculative to show entitlement to relief. (*Id.*) Lastly, the state court noted that when counsel told the trial court he was not calling witnesses, Ibarra failed to alert the court that there were any alibi witnesses available. (*Id.*) Accordingly, the state court found that Ibarra failed to show either deficient performance or resulting prejudice.

Ibarra does not demonstrate that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying this claim. The record supports the conclusion that Ibarra's father refused to speak with police during an investigation. (Doc. 10-2, Ex. 10, doc. pp. 300-01.) Moreover, as the state court found, Ibarra's unsubstantiated claim about his father's prospective testimony is too speculative to warrant relief. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("Johnson offers only speculation that the missing witnesses would have been helpful. This kind

18

of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'" (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985))); *see also Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a petitioner's "unsupported allegations" that are "conclusory in nature and lacking factual substantiation" cannot sustain an ineffective assistance claim).

### 2. <u>Prospective Alibi Witness Maria Ibarra</u>

Ibarra claims that his grandmother, Maria Ibarra, could have testified that "Petitioner arrived home between 9 p.m. and 10 p.m. and remained there until the next morning." (Doc. 1, p. 10.)

In denying Ibarra's claim, the state court relied on Maria Ibarra's deposition testimony, in which she stated that she did not know if Ibarra was at home because she was in bed and did not see him until 7:00 the next morning. (Doc. 10-2, Ex. 8, p. 3.) Accordingly, the state court found that it was "clear in the record that Mrs. Ibarra would not have been able to provide an alibi" for Ibarra. (*Id.*) The record shows that Maria Ibarra testified that she did not know where Ibarra was that night. (Doc. 10-2, Ex. 8, doc. p. 118.) Therefore, Ibarra fails to show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim.

### 3. <u>State Witness Marco Salazar</u>

Ibarra asserts that trial counsel was ineffective for failing to cross-examine Marco Salazar about Salazar's drug use. Ibarra contends that Salazar admitted during his deposition that he used methamphetamine around the time of the murder. Ibarra argues

that counsel should have used this admission to impeach Salazar "as to his ability to observe and perceive matters from the night of the incident." (Doc. 1, p. 12.)

The state court found that this claim was refuted by the record because, when counsel asked Salazar at his deposition whether he ever used methamphetamine, Salazar said he had not. (Doc. 10-2, Ex. 10, p. 7.) The state court also found that counsel did not perform deficiently for not cross-examining Salazar about his admitted marijuana use earlier on the day of the murder, because Salazar testified at his deposition that he stopped feeling the effects of the drug more than six hours before witnessing the murder. (*Id.*) The state court further found that Ibarra could not demonstrate prejudice as a result of counsel's failure to cross-examine Salazar about his marijuana use in the light of the State's evidence of guilt. (*Id.*)

Ibarra has not shown that the state court's denial of his claim involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. As the state court noted, at his deposition Salazar denied having tried methamphetamine. (Doc. 10-2, Ex. 10, doc. p. 320.) In addition, Salazar testified at his deposition that he used marijuana and was high six hours before he walked to his house[9] and was no longer under the influence. (*Id.*, doc. p. 321.)

---

[9] The pages of the deposition transcript included in the record before this Court appear to lack some context to show that the six-hour period referred to was the six hours immediately preceding the murder. However, Ibarra does not argue or show that the state court's ruling was "based upon" an unreasonable factual determination about the deposition transcript. *See* 28 U.S.C. § 2254(d)(2).

Ibarra does not show that the state court unreasonably found that he failed to show deficient performance by counsel. Nor does Ibarra establish that the state court unreasonably determined that he failed to show *Strickland* prejudice as a result of counsel's performance. As Ibarra has not demonstrated that the state court's ruling involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination, he is not entitled to relief. Ground Three is denied.

### D.   Ground Five

Ibarra alleges that newly discovered evidence shows that Sims and Singleton testified falsely at trial. Both witnesses denied reading Ibarra's discovery material. (Doc. 10-4, Ex. 16, Vol. 5, doc. pp. 483, 511.) Ibarra now claims that five individuals who were incarcerated with Sims and Singleton are available to testify that, contrary to their trial testimony, Sims and Singleton admitted that they read Ibarra's discovery in the shared jail cell and that they testified falsely against Ibarra in hopes of receiving more lenient sentences for themselves. Ibarra attaches what he maintains are affidavits from these individuals. Ibarra claims violations of his federal rights to due process and a fair trial.

Respondent correctly argues that the claims are unexhausted. Ibarra's motion for new trial alleged that two of the five individuals had information that Sims and Singleton read and studied Ibarra's discovery in the jail and made a plan to testify against Ibarra in hopes of receiving lesser sentences. However, Ibarra's motion did not alert the state court that he intended to allege violations of his federal rights to due process and a fair

trial. (Doc. 10-3, Ex. 16, Vol. 1, doc. pp. 132-33.) Ibarra did not raise a federal claim when he appealed the state court's denial of his motion for new trial. (Doc. 10-2, Ex. 2.) Nor did Ibarra's postconviction motion allege a denial of his federal rights to due process and a fair trial. (Doc. 10-2, Ex. 7.)[10]

Accordingly, Ibarra failed to exhaust his claim in state court. *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."); *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 457 (11th Cir. 2015) ("The crux of the exhaustion requirement is simply that the petitioner must have put the state court on notice that he intended to raise a federal claim."); *Pearson v. Sec'y, Dep't of Corr.*, 273 F. App'x 847, 849-50 (11th Cir. 2008) ("The exhaustion doctrine requires the petitioner to 'fairly present' his federal claims to the state courts in a manner to alert them that the ruling under review violated a federal constitutional right.").

Ibarra cannot return to state court to raise these claims in a second, untimely direct appeal or postconviction motion. *See* Fla. R. App. P. 9.140(b)(3) and Fla. R. Crim. P. 3.850(b), (h). Accordingly, the claims are procedurally defaulted. *See Smith*, 256 F.3d

---

[10] Ibarra's petition fails to identify when or whether he presented the state courts with the federal due process and fair trial claims raised in Ground Five. Ibarra did not file a reply challenging Respondent's contention that the claims are unexhausted.

at 1138. Ibarra does not argue or establish that an exception applies to overcome the default.[11] Ground Five is therefore barred from federal habeas review.

## V. <u>CERTIFICATE OF APPEALABILITY</u>

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Ibarra must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Ibarra has not made the requisite showing. Finally, because Ibarra is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

It is therefore **ORDERED** that Ibarra's Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Ibarra and in Respondent's favor and to **CLOSE** this case.

---

[11] The fundamental miscarriage of justice exception applies if constitutional error resulted in the conviction of a person who is actually innocent. *See Henderson*, 353 F.3d at 892; *see also Bousley v. United States*, 523 U.S. 614, 623 (1998) ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency."). Ibarra does not argue that he is actually innocent of murder or that the witnesses' information would show that he is actually innocent. Rather, he argues that this information calls into question the legal sufficiency of the evidence and creates "reasonable doubt on the State's case[.]" (Doc. 1, p. 19.) Accordingly, the fundamental miscarriage of justice exception does not apply.

**ORDERED** in Tampa, Florida, on August 23, 2021.

Kathryn Kimball Mizelle
United States District Judge